## THE SECURITY SAVINGS ASSN et, In Re

Ohio Common Pleas, Montgomery Co

Nos 77328, 77468, 78604, 77326, 76310, 78009 & 78605. Decided June 15, 1935

164

John W. Bricker, Attorney General, Columbus, Charles H. Jones, Assistant Attorney General, Columbus, Wellmore B. Turner, Dayton, Herbert D. Mills, Dayton, L. H. Mattern, Dayton, Harry P. Jeffrey, Dayton, Special Counsel, for W. Paul Wagner, Superintendent of Building & Loan Associations.

Gilbert Bettman, Cincinnati, and Raymond S. Powers, Cincinnati, for Shareholders.

## OPINION

BY THE COURT

This matter is before the court upon the applications of the Superintendent of Building and Loan Associations for approval of loans from the Reconstruction Finance Corporation., for the use and benefit of the American, Dayton, Miami, Franklin, and Security Loan and Savings Associations.

Lengthy court hearings were conducted, and several weeks after completion of the evidence and arguments, briefs were filed by counsel. Unusual delay attended the preparation and filing of these briefs by counsel. The final brief was filed by counsel for the shareholders May 28th. The court then took the matter for consideration and decision. The delay in the decision is not, therefore. chargeable in the slightest degree to the court, nor does the court criticize counsel, due to the fact that burdensome duties have been placed upon all counsel of record by the many problems of building and loan association matters before, during, and since the court hearings.

The court has been keenly sensible of the importance of the problems presented, and has, therefore. weighed very carefully, completely and conscientiously the questions involved, and arrived at a unanimous opinion and decision.

It is impracticable. as well as unnecessary, to discuss the evidence and every contention advanced during the hearings. Every question essential to a decision on the actual issues presented in the cases is decided. Such comment as the court makes upon the general problems of these associations is solely for the purpose of explaining the conclusion reached by the court. This is not a law case in the ordinary meaning, but the court, acting as a judicial tribunal, is governed by the facts and law in arriving at its judgment as to whether the applications should or should not be approved.

The record is extremely voluminous. The nature of the applications and subject matter required different procedure from. that of an ordinary lawsuit, and the court, therefore, accorded the fullest possible oppor-

tunity to all interested parties to be heard, and indulged, with extreme patience, every reasonable request of counsel and the interested parties. The most liberal application of the rules of evidence practicable was made, to the end that all helpful information be placed before the court.

The applications are largely identical as to general content, with such differences as are required by the legal status of the associations, and the facts involved in each particular case. Briefly, the Superintendent seeks authority to borrow money in an amount not in excess of the sums indicated in the applications themselves.

The maximum commitment of the Reconstruction Finance Corporation to the respective associations is as follows:

| | |
|---|---|
| American | $7,941,453.38 |
| Dayton | 2,330,744.16 |
| Franklin | 2,700.530.47 |
| Miami | 3,987,513.32 |
| Security | 722,839.24 |

The proposed purposes of the loans, as indicated in the applications, are:—

1. Payment in full of determined liabilities, including borrowed money, interest due, taxes, certificates of deposit, temporary deposits, escrow funds, claims filed, and other listed items.

2. Payment of interest accrued on the existing indebtedness to Reconstruction Finance Corporation to date of disbursement of new loan.

3. Provision for a reserve for purposes indicated in the applications.

4. Provision for a sum of money to pay interest upon deposits to date indicated in event determined to be required.

In the Miami and Security Associations the disbursements proposed are 25% of the general creditor claims preferred to shareholders, as distinguished from 100% in the other associations.

The applications set forth the conditions of the commitments which are made by the Reconstruction Finance Corporation, in general detail, and the agreement of the Home Owners Loan Corporation to make available its bonds for exchange for mortgages not in excess of the amount of $12,000,000.00. They also state that the agreements of the Home Owners Loan Corporation and of the Reconstruction Finance Corporation are conditioned on the formation of a Federal Savings and Loan Association in Dayton, with a local stock subscription of $3,000,000.00, to be supplemented by full paid income shares and savings shares, optionally, of the

Federal Savings and Loan Association, under the rules and regulations of the Federal Home Loan Bank Board.

The court finds that it has full jurisdiction to adjudicate the issues presented in these applications, and every motion; demurrer, or other pleading directed towards its jurisdiction is overruled as being unfounded. The reasons for the court's decision in this respect are too patent to require statement.

During the hearings, the Superintendent of Building and Loan Associations indicated that due to the improved financial condition of the Mutual Home and Savings Association and the Permanent Building and Loan Association, there was no further necessity of seeking the loans for them, and consequently the court received no evidence and gave no consideration to these two associations, directing that they be withdrawn. The Superintendent also indicated that improvements in the financial conditions of the other associations, subsequent to the date of the inception of the plan, materially reduced the amount required to be borrowed, and therefore, he advised the court that the amounts now proposed to be borrowed are:

| | |
|---|---|
| American | $5,562,891.71 |
| Dayton | 585,924.31 |
| Franklin | 1,349,884.40 |
| Miami | 2,247,476.87 |
| Security | 383,788.00 |
| Total loan | $10,129,965.29 |

It is urged by the Superintendent that approval of these loans will effect realization of maximum value of shareholder equity, effect return of the associations to the shareholders, and pay off creditor claims, and this will be accomplished by funding existing indebtedness, deferring maturity of the funded obligation, reducing the carrying charge of indebtedness, and providing means of payment of funded obligations and promoting the interests of the associations generally.

The shareholders opposing contend that it is inequitable to require them to pay immediately the holders of certificates of deposit; that it is not sound policy to borrow in order to settle debts and pledge assets for the loan; that the loan is unnecessary, contrary to the associations' interest, and that its terms are unreasonable.

There are at present seven institutions in Dayton under State control and management: The American, Miami, Security, Dayton, Franklin, Permanent and Mutual

Associations. This control is predicated upon the proposition that these associations are of such quasi-public nature, and in such condition, that the State of Ohio is justified, in the exercise of its fundamental police power, expressed in specific statutes, in maintaining at present either complete or restricted administrative control. The avowed present purpose is return of the associations ultimately to shareholder management, although it was asserted by counsel for the Superintendent during the court hearings that the Miami and Security must be completely liquidated. It is not the province of the court to consider generally the action of the State executive authority in relation to these associations, except insofar as such consideration may effect the decision on the applications.

Some degree of confusion has constantly obtained as to the relation of the court to the administration of the associations by the State. The court has never been, and can never be, administrative in nature, in duties, or in fact. Legislation requiring certain administrative acts of government to be submitted to the court for approval or rejection does not change the constitutional independence of the judiciary from the legislative and executive, nor charge it with administrative functions.

The law provides that in certain matters requiring the decision as to opposing interests in the associations, while under State administration, the Superintendent shall make application to the court, and the court shall consider the evidence and the law applicable to the matter presented, and either approve or disapprove the action contemplated. This does not mean that the court administers the trust itself, nor that it has the duty or right to formulate financial policies and managerial programs. In the discharge of its duties the court has not been, cannot be, and will not be, controlled or directed either by the State officials or the shareholders. As a court it decides matters properly before it, and can never accept its legal duties, or exercise its constitutional rights, as privileges from either the State officials or the shareholders. While its doors are open to proper appeals from the State and the shareholders, and while it is inherently constituted to hear, consider and decide matters properly before it, the court remains entirely separate and apart from all litigants.

The animosities, excitements, prejudices, organized actions and demonstrations of interested parties neither confuse nor affect the court. The court's duties are of such fundamental importance, and detached, calm and dispassionate judgment is so essential to justice that no citizen of proper purposes will undertake to affect it by public or private demonstrations of hostility.

It appears to the court that impartial consideration of the many difficult problems presented in reference to these building and loan associations will be of invaluable assistance in reaching sound and safe policies for the future.

In this connection, the court expresses the opinion that those officials of the State and National Government, as well as others in individual capacities, who labored diligently to prepare and present the plan involving these loans were earnestly seeking to solve the extremely difficult problems of the associations.

Matters were injected into the hearings on these applications extraneous to the actual issues involved and confusing as to the merits of the case. This observation is particularly applicable to the constant criticisms of counsel for the shareholders of the HOLC program, and constant emphasis upon allegedly disastrous results of the program as conducted. Due to the fact that the plan involves further utilization of HOLC to some extent, the court permitted evidence in reference to the general nature of HOLC operations. Counsel for the shareholders, utterly uninformed as to the evidence in the HOLC cases which the court had adjudicated in open court, labored under the impression that the HOLC program had been injurious to the interests of the shareholders. This impression is basically erroneous, unfair to the hundreds of applicants, the administrative officials, and the courts which carefully adjudicated the cases.

Any fair and impartial consideration will reveal that the HOLC program served a distinctly vital purpose, accomplished very definite helpful results in behalf of the associations, and safeguarded the social security of the community by protecting hundreds of home owners from the loss of their homes. These associations were in a process of State liquidation at the time the HOLC program was inaugurated, and in hazardous financial condition. As institutions with basic assets resting solely in real estate mortgages, and being dependent on payment of interest and principal on these mortgages, it was inevitable that they should be distinctly distressed by the local and general collapse of the economic and financial structure.

There is no occasion to conceal the dire need and distress of most of these associa-

tions at the time the State took control: they were then confronted with a serious shortage of money, the cash reserve obtaining being very negligible; creditor claims were being pressed; taxes on property owned by the associations were delinquent; and nothing adequate being accomplished in the associations to avoid further freezing of assets. Being unable to render liquid their assets by any financial operations within the association, due to the fact that the sole recourse was foreclosure proceedings against the delinquent mortgages, the associations experienced great difficulty in further operating.

If these associations had attempted to solve the frozen asset condition by wholesale mortgage foreclosures, such a policy would have been plainly disastrous, not alone to the mortgage debtor but to the association, itself, and a wholesale foreclosure policy could not have been completed due to the fact that most of the properties, in delinquent condition justifying foreclosure, had accumulated large tax delinquencies and were badly in need of repairs. Foreclosure entailed payment of taxes by the associations and the rehabilitation of the properties.

The associations' loans from the Reconstruction Finance Corporation were all in default, and no extensions secured, so that foreclosure on the assets was legally possible. The average property holder with an association loan was unable to refinance and properly adjust loan delinquencies. A wholesale program of foreclosures would have further depressed the psychology of home ownership in the community, and destroyed the real estate market. There had been a marked depreciation in property values in general, so that many property holders realized that the loans which they originally secured, now frequently in pyramided condition, amounted to more than the present value of the property. Deficiency judgments being rarely of value, the associations would have added to the real estate owned without increase of liquidity. The condition of the associations would have been strikingly worse, for already overloaded with non-liquid assets, their burdens would have increased.

For these and many other acceptable reasons, the associations were forced to turn to some source of emergency financing, and were fortunate in having available as a refinancing agency the Home Owners Loan Corporation. It is unreasonable to now condemn the operations of an emergency program without which the associations could not have approached liquidity.

The HOLC cases were carefully prepared and presented, with extensive evidence, in public court hearings, open to every citizen of Montgomery County, after advertisement in both daily papers. Any implication that the courts hearing the cases did not carefully, conscientiously, and fully review the facts in the cases is so untenable as not to deserve comment. Shareholders' committees had ample opportunity to check on the appraisals and testify in court, to show opposition to the particular case, if it was not worthy of favorable decision. No court denied this privilege.

The results of the operations speak indisputably to the soundness of the program.

The total value of the bonds received is less than the book values of the mortgages for which they were exchanged, and it is to this difference that counsel for the shareholders constantly referred as a loss. To term this difference a loss is merely to take academic advantage of a difference of figures, for the loss was not caused by acceptance of the bonds but already existed, unannounced, and concealed by misleading book values.

In many instances, the properties had never been worth the face of the mortgage, and in no instance, so far as the court is informed, were the properties worth more than the bonds for which the mortgage was exchanged.

Obsolescence, physical deterioration, and general depreciation obtained in thousands of properties. In addition to this, certain sections of the city had experienced marked sectional depreciation due to quick gregarious influx, causing conditions contrary to usual and normal standards of living. No appraisal of these associations' properties at fair market value had been made, book values being accepted as actual values, so that the depositors and shareholders were uninformed as to the actual values of these associations' assets.

The effect of this policy in reference to assets was distinctly harmful, and it is not helpful to the formation of sound policies to resist and reject this information now. If the shareholders are trying to establish a sound policy for future operations, these basic facts cannot be ignored.

Even though there be some elevation in real estate values, hundreds of association properties will never increase in value. Book values are not real values. Actual facts as to these assets were revealed in the court hearings of the HOLC cases, when book

values were compared with fair market values. In these hearings, the court considered the condition of the mortgage debtor, his work or lack of work, size of family, earning capacity, earnings and income, age, likelihood of being able to pay the mortgage, physical condition, personal attitude towards the debt, resources in any form whatsoever, the appraised value of the property, cost of foreclosure, and then decided whether it would be for the best interests of the association to accept bonds of the HOLC rather than to foreclose upon the property.

Through the HOLC program, the associations have been given liquid assets smaller in amount than the alleged book values of the property for which they were taken, but far greater in amount than could have been obtained by a process of foreclosure. Whatever chance the associations have now for liquidity and for final return to shareholder management may be attributed almost conclusively to the HOLC program, resulting in the payment of pressing debts which obtained, the payment of taxes, rehabilitation of property, and general improvement in association finances.

The fundamental idea underlying building and loan associations is the encouragement of thrift and home ownership, the improvement of community life, and advancement of the ideals of citizens as to their social and civil responsibilities. It is apparent that men of thrifty disposition need institutions to which they may safely entrust their savings, and at the same time benefit from membership involving mutual interest and responsibility, with reasonable increase of their savings through accruals resulting from wise operation of the association, for the benefit of all interested in it.

It is important to consider the propensity of the associations under consideration here to accept deposit money, that is, money deposited either on general deposit with the association upon issuance of a certificate of deposit to the party making the same, or special deposits largely governed by the same regulations as pertain to general deposits. This was particularly noticeable during the years of inflation preceding the crisis of 1929.

The evidence in the case discloses that at the time of the hearings the total amount of deposit and claims preferred to the claim of the shareholders was. $14,730,306.09, of which total the sum of $228,761.93 represents the total of all such accounts in amounts less than deposits of $100.00. The

entire balance represents the total of accounts above $100.00.

An analysis of the records of the American Loan and Savings Association indicates that in 1923 the amount of stock was practically twice the amount of deposits; in 1924, the amount of deposits had increased to practically two-thirds the amount of stock; in 1925, practically the same proportion obtained as in 1924; in 1926, the stock rose to approximately $9,000,000.00, and the deposits rose to approximately $6,500,000.00. A marked change occurred in 1927, where the records show that the stock amounted to $10,496,913.23, and the deposit money, $9,296,298.40. In 1928, the stock amounted to $11,754,406.87, whereas the deposit money increased to $10,619,410.79. This represents the closest approach of deposit money to stock, and it is noticeable that the money on deposit represented practically 90% of the same estimated values of the stock of the association. Between 1928 and 1930 there was a decrease of four and one-third million dollars in deposit money. The records of the association at present show that the stock amounts to $8,104,269.46, whereas deposits and claims preferred to stock amount to $4,970,317.79.

This analysis of the record indicates, therefore, that the American Association made decided and radical departure from the original conception of loan associations, and unduly increased the amount of its obligations to deposit and specific loan claimants, resulting, before the depression, in excessive loaning, and resulting after the depression, in inability to meet the claims for the money loaned to it, which in turn had been placed out in the hands of individual borrowers. An analysis of the records of the other associations will show, to a large extent, similar operations, though the proportions are different.

When the depression began to affect the financial security of the American and other associations, the difficulty of repayment of those vast sums of money borrowed and used by the associations, and the increasing difficulty of individual borrowers in meeting obligations which they owed to the association, inevitably contributed to the collapse of the institutions.

In the instance of the Miami, the records disclose that in 1927 the amount of stock was $5,903,658.25, and the amount of deposit money was $5,703,620.92, the two amounts being very close to the same figure. In 1928, the stock values are indicated as being $5,883,232.29, whereas the deposit claims are recorded as being $7,459,507.93.

This interpreted means that the deposit claims were almost $2,000,000.00 more than the stock claims. In 1929, the stock recorded amounted to $5,802,368.41, whereas the deposit claims amounted to $6,954,457.92, a decrease in the proportion of deposit claims to stock claims, but an indication that the deposit claims were still recorded as being $1,000,000.00 more than the stock claims. In 1929 and 1930 there appears a marked increase in stock, but analysis of the record shows that this was due to a transfer of $1,914,032.10 from special book and deposit records to running stock, and also the acquisition of $1,331,308.21 from the running stock and paid-up stock of the Buckeye Building and Loan Association.

It is very apparent that these associations departed from the original purposes and conception of building and loan associations. This departure did not transform the associations into banking institutions, but afforded opportunity to investors wishing larger returns upon money than banks could pay, and they confidently assumed the risk of placing their money in these associations, which were disregarding some of the salient safeguards which originally attended loan associations, and entering into the general financing of community and real estate developments too heavily and too extensively. This induction into the associations of large totals of deposit money, rather than the use of moneys particularly created by the normal operations of the associations in a normal manner, inevitably created one of the most difficult problems now confronting the associations; the problem of satisfying deposit claimants without being forced to sacrifice the assets of the association.

Since these loans are to be used to pay the holders of certificates of deposit, it is necessary to consider whether they are demand claims, and whether they must be paid now.

During the decade preceding 1929 particularly, the average person dealing with the associations in Dayton was unfamiliar with the exact nature of his contractual relationship. Thousands of people took their savings to the associations, believing that they were the safest and most useful institutions for the protection of their money and for the earning of a reasonable profit for its use. Few of these people understood the corporate structure of the associations. Savings of life time labors and struggles were offered to the associations with the utmost faith and in the expectation of and the belief in withdrawals at

will. Many now listed as shareholders originally regarded themselves as merely depositors in the institutions, and never intended otherwise. The general hardship of both shareholders and depositors is explanatory of the gravity of the present proposed plan, for the plan requires that the shareholders assume immediately a large demand debt in order to pay off the claims of all holders of certificates of deposit, except in the Miami and Security, where a payment of 25% is sought to be made.

While it is contended that there has been no inclusive adjudication of the status of certificate of deposit holders and shareholders, statutory procedure has been followed by the officials in charge, and there has been statutory classification of claims, and for the purposes of the law, an adjudication. If there be any legal basis for a different classification of a claim, it may be asserted in the proper manner on the facts of the particular case, rather than upon general assertions as to equitable rights and privileges.

The confusion as to legal status was complicated by the former indifference and inactivity of shareholders in the management of the business, and the perfunctory attitude of many in charge of the management as to the nature of the contract desired or made with the shareholder or depositor. Elections being formal ratifications, directors and officers being in practically absolute control, dividends and interest being paid, no inquiry or interest obtained as to the form and effects of these contracts.

The court is not now adjudicating the legal rights of the certificate of deposit claimants, but since a policy affecting payment of his claim is being submitted to the court, an analysis of the general relation of the depositor to the association in which he made his deposits is essential. This decision is not preadjudication of cases involving certificate of deposit claims under special facts.

From a general viewpoint, the shareholder and the depositor were in the association together, enjoying its advantages, when advantages were obtainable: the shareholder, by his membership, was subject to the regulations and law attendant upon membership, charged with responsibility and subject to liability as a shareholder; the depositor, not becoming a member, but depositing his money under a definite contract, being a creditor of the association for the amount of his deposit, subject to the terms of his contract, has very definite legal

claims against the association. While the depositor had definite rights in reference to withdrawal of his money and interest on it while on deposit, the association had contract rights in regard to retaining the money on deposit and contractual obligations in reference to paying interest for its use.

The association is permitted by law to accept deposits but is prohibited by law from accepting demand deposits. This restriction against acceptance of demand deposits fundamentally differentiates the associations from banks, and regardless of current practice in past years in permitting withdrawals freely, the association was not then and can not now be held to banking demands. The associations are statutory corporations, subject to all statutes pertaining to their operations, and have been legally authorized for many years to receive money on deposit, and pay interest at a rate not exceeding the legal rate, and are so empowered now by §9648, GC. However, the withdrawal of such deposits is not optional with the depositor, but is a matter of contract between him and the association.

Sec 9652 GC provides that the association is empowered to permit withdrawal of deposits upon such terms and conditions as the association provides, except by check or draft. The section further prohibits demand deposits. in these words:—

"* * * but no such association shall be permitted to carry for any member of or depositor any demand, commercial or checking account. * * *"

The association not undertaking banking obligations, the action of the legislature in respect to depositors is logical and salutary. Due to the very nature of the Building and Loan Associations, and due to the fact that their assets consist of mortgages securing notes from which the association has neither expectation of nor legal means for, forcing immediate payment, such policy being contrary to the very purpose of the organization, it was essential that there be no demand deposits permitted.

The right to withdraw money was, therefore, a proper subject for contract between the depositors and the association.

The certificates of deposit in general clearly state the terms and conditions of the contracts, and the depositor is bound by the contract. On the face of the certificate, acceptance of the deposit is indicated, subject to the constitution and by-laws of the association, and on the reverse side there is printed the restrictive conditions as to withdrawal, generally being verbatim excerpts from the by-laws.

An illustrative certificate is in these words:—

"The Franklin Savings and Loan Association of Dayton, Ohio. Organized June 2, 1879.

"This is to certify that ...... has deposited the sum of ........ Dollars in the above named association, subject to the by-laws of said association, the conditions herein, and the conditions printed on the back hereof, all of which are agreed to by the depositor.

"This Certificate, if left for ........ or longer will bear interest at the rate of per centum per annum, payable semi-annually, in April and October of each year, and on withdrawal.

"Issued at Dayton, Ohio, this ...... day of ........., 19...."

On the reverse side of the Certificate, conditions of withdrawal are set forth in detail. and among these conditions is the following:

"First. Depositors whose deposits are not pledged to this association may, as a general rule, upon written application to the secretary, withdraw without previous notice, but to protect the interests of depositors and borrowers and avoid sacrifice of securities, notice of withdrawal may at any time be required. Notice to withdraw shall be deemed the same as an actual withdrawal, and the right to interest shall cease with any such application to withdraw. Such notices shall be filed in the order in which they are received, and paid in accordance with the general withdrawal rule and the by-laws of the association."

The certificate of the American Association provides practically the same as the one just quoted, having on the face the phrase, 'in accordance with the conditions named in the constitution and by-laws of said association, and printed on the back of this certificate." On the reverse side of the certificate is the following:

"Depositors, whether on stock or special deposit, may withdraw the whole or any part of their deposits from the association at any time by giving two weeks' notice, and the right to dividends and interest shall cease with such notice, at the option of the association; provided, however, that

should the applications for withdrawals at any time exceed the receipts available for the payment of same, such applications shall be filed in the order in which they are received and paid in the order in which they are filed, as fast as the receipts of the association available for the purpose will pay them. Dividends and interest of withdrawing depositors shall not have precedence in payment over other dividends and interest."

The certificate of the Miami Savings and Loan Company has a similar provision, and on the reverse side of the certificate, practically the same provisions, and, in addition, this specific provision:

"Should the applications for withdrawal of stock or deposits at any time exceed the cash on hand, such applications shall be filed in the order in which they are received and paid in the order in which they are filed as fast as the receipts of the company will pay them, and such payment shall be without preference as between members and depositors."

The depositor did not elect to assume shareholder liability, but seeking a greater rate of interest than is paid by the banks, entered into a conditional contract with the association, limiting his withdrawal rights so that the association might not be put on immediate demand for return of the money deposited, and subjected to possible attendant difficulties. This was essential for the preservation of the association, particularly since acceptance of deposit money in general was a departure from the original purpose and an innovation in the financial structure. Absence of this contract limitation might imperil the security of the association, by requiring it to make sacrifice of securities in order to realize suddenly demanded cash.

The depositor's contract then consists of his agreement to deposit money, the agreement of the association to accept the money and pay him interest therefor, and his agreement to leave the money in the association subject to withdrawal under the limitations of the pertinent by-laws and regulations, which were incorporated in the contract itself. The by-laws and regulations did not govern the depositor as a member, but, as the subject matter of the contract, defined and restricted his rights of withdrawal. The withdrawal right of the depositor not being absolute, he has no

vested interest in the association subject to immediate compulsory delivery.

As to his interest payments, if and when the same were payable out of the earnings of the association, his rights are prior to any right of any shareholder to enjoy dividends on shares unless otherwise provided in the contract, and it is the legal obligation of the association not to divert unlawfully the money loaned to it and the money created by its operations to purposes contrary to the contract of deposit and loan, and thus impair the depositor's right to ultimately realize the return of his money.

A further term of the contracts, generally, provides that the depositor had a right to make a demand for the return of the money, and this demand has priority over demands subsequently made by other depositors. The association cannot apply unreasonably the funds created by its operations to other purposes in violation of the withdrawal right of the depositor. On the other hand, the depositor cannot wreck the institution by demanding return of his money regardless of the effect upon the association.

It is essential to the very existence of the association that neither shareholder nor depositor shall be empowered by law, by regulation of the association, or contract to place the association in such jeorpardy that the entire membership may be caused heavy financial losses because of the disposition or necessity of the shareholder or depositor.

The court finding, as a general proposition of law, that the depositor in these associations is without absolute right of withdrawal, by the very terms of his contract and the law, the next inquiry is whether the shareholder has breached the contract so as to entitle the depositor to rescind it, and then proceed to secure his money as money had and received. Neither insolvency, nor lack of liquidity, nor assumption of control of the association by the State is a breach of the deposit contract.

To the contention that the association has breached the deposit contract by failure to pay interest and by failure to meet the withdrawal demand, the insurmountable answer is that the associations are at present under operative control of the Superintendent of the State Building and Loan Department. This control by the State retires shareholder management, and every act of the Superintendent of Building and Loan Associations is the act of the State, not chargeable to the shareholder, and since he does not have possession of or control over his property, he cannot be

regarded as breaching the contract. If present breach be alleged, it results, in fact, from an exercise of the inherent police power of the State to directly control these financial institutions in order·to safeguard the interests of the shareholders, the certificate of deposit holders, all claimants, and the public through proper administrative action, upon legal cause found.

If the breach alleged is regarded as consisting of the failure to pay interest and permit withdrawals before State control was commenced, the answer is that State control terminated opportunity or privilege of the association to carry out its ·contract, according to its rights obtaining under its terms, and thus operation of law interposes complete defense.

Counsel for the Superintendent contend in their brief that the depositor contract has been breached by the insolvency of the associations and by the take-over of the associations by the State. These two grounds are inconsistent, and contradictory. If·breach was effected by insolvency, it obtained before the take-over by the State, and if it be regarded as a breach, the contract could not be subsequently breached by the take-over. Insolvency is not a breach, particularly when the deposit contracts afford no absolute rights to the depositor.

Further, the assumption of control by the State was an exercise of police power, and as stated hereinbefore it cannot be charged to the shareholders. Being authorized by statute, it cannot be held a breach of a civil contract between other parties. The State did ·not and could not breach a contract to which it was not a party, and the association could not breach it through State· action.

The contention of State counsel may be clarified by reverting to the authority upon which reliance is placed. The Supreme Court decision in **Warner v Mutual Building and Investment Company, 128 Oh St, 37,** quoted in the State's brief, discussed rescission, not breach. Rescission and breach are not legally synonymous. The Supreme Court held· that insolvency ended the capacity of the association to carry out its contract with members and shareholders, and as a matter of law rescinded it.

This opinion of the Supreme Court is not rejected, but the facts and purport of the case are entirely different from the propositions presented here. The court in that case was justifying, primarily, the right of the Superintendent of Building and Loan Associations to appeal from a decision that

a contest over the legality of the Superintendent exercising the powers vested in him by §687-2, GC, was not a chancery case. The court was merely showing the nature of the control of the Superintendent, and incidentally discussed the effect of State control. No actual case as to the rights of a depositor was before the court, and no decision made as to his rights or the breach of a deposit contract.

The brief of counsel proceeds upon the theory that absolute dissolution of the corporation has been effected by State control, whereas, in fact, statutory State control has the operative effect of dissolution but that effect is only for administrative purposes of the trust itself. It may not result in ultimate dissolution, and in· fact, in the instant cases, in the very contentions of the Superintendent, it is urged that the associations are to be returned as such to the shareholders, as corporations.

Adopting the words of the Supreme Court in ·the case cited by the State, and discussed supra, in discussing the effect of State control: ·

"The courts below held in effect that the proceeding provided for in these sections is in fact a proceeding ·to dissolve the corporation. It must be admitted that the proceeding may result in dissolution of the association, but we do· not reach that provision until we reach §687-21, GC. It may not result in dissolution. It may rehabilitate, as provided by §687-23, GC."

If it be held that absolute rescission of the contracts of deposit was made by operation of law, by the ·State take-over, on the theory that dissolution is legally effected, then the further provision of the statute that the effect of dissolution is cancelled by the act of the Superintendent in restoring the associations to shareholder management would assuredly reanimate. the contracts, and restore them in their operative effects and benefits. There is no advantage in considering that the associations are dissolved, for, as the court has stated, the actual facts are that they are neither legally nor factually dissolved unless and until final and absolute liquidation is completed, and in the instance. of these associations the Superintendent urges that they will be rehabilitated and will be returned to shareholder management.

The court considers that the deposit contracts, under the facts, are held·in abeyance as to operation, and that so far as the depositors and the associations are con-

cerned the contracts will again commence to operate upon restoration of legal management to the shareholders.

Therefore, the depositors cannot force payment now from the State, except in due course of its administration of the trust, nor, since they could not, prior to State control. exercise the absolute right of demand depositors, can they be endowed with that attribute upon emergence from State control.

The court finds, therefore, that there is no general law, applicable to the deposit contract claims as presented in this hearing, requiring that they be regarded legally as demand claims. This opinion is not prejudgment of particular cases presented upon particular facts, but for the purpose of this decision and upon the most careful consideration of the law, the court finds that there is no legal necessity for paying certificate of deposit claims as such, as if they were unconditional demands for payment of money.

Adopting the words of the Supreme Court, in the case of **State ex Bettman v Court of Common Pleas of Franklin County, 124 Oh St, 269:**

"What rights would arise on behalf of a depositor, or others. in the event of failure of the superintendent of building and loan associations or of the attorney general to promptly, fully and faithfully. perform their duties with respect to such institutions need not be discussed at this time, for no such question is presented in this case."

The court, in reaching its conclusion that the claims of the depositors are not demand claims, is in full acrord with the decision of the Supreme Court, in the case of **The Fourth Central Trust Company v Rowe, Administrator, 122 Oh St 1,** the second syllabus of which is as follows:

"The reasonable rules and regulations adopted by a savings bank and printed in its pass book, signed and agreed to by a depositor, form a contract between the bank and the depositor, and each is bound thereby unless such rules and regulations are contrary to some positive rule of law or are against public policy."

However, the conclusion of the court in the instant case is based upon the broader aspects of the law and the particular provisions of the contracts, as indicated hereinbefore.

In concluding disposition of this aspect of the matter, the court directs attention to the further very significant fact that if the certificates of claim were absolute in nature, and if State control destroyed the deposit contracts and vested rights required immediate payment, there would be no occasion for the existence or use of the law provided in §687-23, GC, regarding rehabilitation:

"Sec 687-23 GC. A domestic building and loan association in the course of liquidation under any provisions in this chapter may resume business when and if (1) at a meeting duly called and held, a resolution to such effect is adopted by the holders of fifty-one per cent of the stock entitled to vote thereon; (2) the owners of at least two-thirds of such association's total deposits, if any, consent thereto in writing; (3) the superintendent of building and loan associations recommends that control of the business and property of the association be returned to the shareholders; and (4) such court upon application grants approval of the superintendent's recommendations which approval shall contain a finding that such association will be in safe and sound condition when control is resumed by the shareholders. Provided, however, that if the association has been dissolved pursuant to §687-21 GC, the stockholders meeting shall be called and the vote taken by the holders of the stock in the same manner as though such association had not been dissolved. Provided, further, in event the superintendent permits resumption of business upon a restricted basis, as hereinafter provided, the said resolution of the stockholders and the written consent of the depositor shall not be required.

"Such building and loan association may resume business upon a restricted basis, and upon such limitation and conditions as may be prescribed by the superintendent, when approved by the Court of Common Pleas in and for the county in which such building and loan association is located, upon application by the superintendent. Such restrictions and conditions may include, among others, a prohibition against taking deposits, or the selling of shares, reasonable restrictions upon the withdrawal of deposits, and the payment of other liabilities."

The contention that this is retroactive legislation and cannot apply to the instant deposit contracts is probably fundamentally answered by the observation that §687-23,

GC, supra, relates to the remedy of the certificate of deposit holder, and being remedial is not under the ban of the constitution, and furthermore being an exercise of police power in behalf of the very certificate of deposit holder complaining, should be liberally interpreted, and further, upholds the contract of the parties, even as to delaying the remedies.

While the deposit certificate claims are not demand claims, they are not identical in nature or legal effect with shareholder claims. The associations borrowed the money of investors who placed it in the business on contract: tne relationship of debtor and creditor was thereby established, and the money used, not through the directions and control of the creditor, but through management of the owners of the association. As a matter of law, the shareholders were charged with the proper management of the association, to the end that moneys borrowed might be returned in due course, and interest might be paid for the use. The depositor was not in position to control or assist in controlling the management of the property except in cases where a depositor was also a shareholder.

The depositor who was also a shareholder had some degree of control, however remote and however inadequately employed, over the affairs of the association. The depositor might have proceeded in court against the association, if the directors were improperly managing its business, and this, not as a matter of right by virtue of being a part of the association, but as a creditor seeking to regain money invested in the association by contract. Furthermore, the depositor had less opportunity than the shareholder to ascertain the management or mismanagement of the association, and less opportunity to become familiar with the nature of the assets, the mortgage loans, and all the attendant problems developing in the management of the business.

The depositor had two distinct legal rights, neither of which could be exercised except upon maturity of facts justifying their exercise; if he was denied interest contrary to his contract, and if money was earned sufficient to pay his interest according to the contract, and was diverted into other channels and uses, in violation of reasonable interpretation of his rights and in abuse of discretion by the directors, he would have had grounds for rescission of the contract and action to recover his money as money had and received; if, after complying with the contract himself, by posting notice of intention to withdraw, he demanded withdrawal of his money, and if under the terms and conditions of the contract he was denied the right of withdrawal, even though money was available for paying his withdrawal demand and was used for other purposes, in violation of his contract rights, he would have grounds of rescission, and could proceed to collect his money from the association.

Further, if, under liquidation, the liquidating agent should proceed, in violation of the trust and law, to dissipate and unlawfully destroy resources of the associations in violation of his rights as a creditor and thus defeat his claim upon the trust subject matter, the depositor would have a right, in a court of proper jurisdiction, to proceed towards the collection of the debt due him.

Therefore, regardless of the fact that depositors and shareholders, to a large extent, were in the associations for the purpose of investment, and from that very association there developed an ill-founded conception that all were on an equal basis, the fact remains that as a matter of law the shareholder and the certificate of deposit holder are not on the same legal basis. Persistent claim to this effect, originally due to lack of information, and often now, apparently, due to unwillingness to admit the facts, has been inimical to the development of sound policies, and has tended to cause confusion generally amongst the shareholders. Sound policy may be more readily formed when it is fully realized that these definite, accumulated, and large deposit claims must be retired and paid in full before any realization whatever can obtain in behalf of the shareholders. The fact should be faced frankly, and the shareholders should be informed clearly of this limitation upon their privilege or the probability of withdrawing or realizing dividends upon the stock.

Throughout the hearings the constant assertion was made that the business belonged to the shareholders, and this, while true, is unfortunately calculated to lead the shareholders to the impression that they have a right to manage the association business as they might determine and see fit. This grave misapprehension should not be encouraged, for even though the certificate of deposit holders do not have demand claims for the unconditional payment of money, they have such claims as may well be calculated to deter, at law, the shareholders from proceeding in careless manner in the management of the business, and which might conceivably deter the State from proceeding in careless manner, with-

out proper restrictions and limitations, calculated to jeopardize their creditor claims.

If these basic facts are kept clearly in mind, the shareholders will comprehend more fully that there is scant reason to expect, whether the associations are kept under liquidation or returned to shareholder management, that the individual shareholders will realize, at any immediate time, relief from the distress in which they are placed. Asset losses, through depreciation and former over-valuations, will necessarily have to be absorbed, except insofar as the values are rehabilitated through economic and community progress. It is scarcely to be expected that paper legerdemain can establish full recoupment of basic losses.

Concluding, therefore, that the certificates of deposit, being prime claims on the assets, may eventually be paid in full, whether through liquidation, refinancing by the associations or gradual retirement of the deposit debt under shareholder management, it is necessary to consider whether the policy proposed is for the best interests of the associations as such, since the State now proposes return to shareholder management.

Assuming that there is legal authority to anticipate payment in full of the existing deposit contract claims now, solely by virtue of the emergency legislation and State control for liquidation purposes, the court is now forcefully presented with a change in the administrative purposes of the State, and a material departure from the former policies. The question, therefore, narrows to the inquiry whether these loans are for the best interests of the associations in view of present official plans. If, by approving the loans to retire the certificate of deposit claims, the court could rightfully conclude that the best interests of the associations were served, it would be a helpful solution of a difficult financial problem.

It is not possible to calculate the exact effect of forced refinancing on institutions of the nature of these. To suddenly transmute conditional claims into promissory notes, with extensive and rigid default conditions, and to pledge all the assets of the associations, and place all income beyond association management, under just but stringent contract provisions, for payment of the note, is a very grave undertaking. This would be of extremely doubtful policy even in an open and going association, in normal times, and it may be rightly regarded as a doubtful venture rather than a helpful policy for associations situated as these are, and in times so critical. As the

court will indicate later in this decision, even if there were originally sound chances of the success of this policy, the developments in the community since its original proposal have already defeated its potential usefulness.

These loan obligations result in comprehensive change in the basic financial structure of the associations. Financial support investment money deposited on contract is withdrawn and replaced by loans subject to absolute demand claims. Ordinary business could scarcely hope to survive the strain and additional burden imposed upon it by such action. If heavy debt and interest charge can be liquidated by reasonable and safe conversion in form of assets, without attendant danger to the business, it may be considered sound policy. In this case, loans are proposed for extraordinary purposes and might jeopardize accomplishment of sound rehabilitation.

It is, therefore, a business anomaly to require these distressed associations to retire all these conditional demands, when it is impossible to effect this from the present available resources of the association.

The Legislature has expressed the general policy of the State in reference to the authority of the building and loan associations to borrow money by the enactment of specific legislation limiting the amount which may be borrowed. §9656 GC, recently reenacted under date of May 16, 1935, effective June 5, 1935, as an emergency measure, limits the amount that building and loan associations may borrow to a maximum sum not totaling more than 30% of the money paid into the association by the shareholders and depositors. It appears to the court that if this is sound policy for building and loan associations in general, it should not be ignored by the court, and that its restrictions are even more salutary and necessary for associations in such condition as these now under consideration, already in difficult position, and partly due to original excessive borrowing.

The evidence does not disclose the exact amount paid into the associations by shareholders on shareholder obligations, but even if it be assumed that all shareholder obligations are paid in full, and this total added to the sum total of the deposits obtaining, the associations would not be permitted to make loans of this magnitude if not under State control. Without applying the legislative limitation to the exact conditions of these associations on account of the uncertainty as to the amounts involved, the court is of the opinion that the law an-

178

nouncing the State policy of general limitation of debt should be given due weight in disposing of these applications, even though the associations are in process of liquidation, and the State Superintendent of Building and Loan Associations might be able, by virtue of special statutory authority, to make loans in different amounts from those obtaining were the associations not in liquidation.

It is not necessary for the court to decide here whether the specific authority of the State Superintendent of Building and Loan Associations, under the statute therefor provided, must be considered and interpreted in the light of the limitation of §9656, GC, but since the limitation exists it should be given proper weight in this decision. Further, since this statute, by limiting the amount which an association can borrow, if applied to the closed associations in reference to borrowing to satisfy the claims of the certificate of deposit holders, would reach to the question of remedy under their contracts rather than to the substantive rights of the claimants, it would not be regarded as retroactive regardless of when the present contracts of deposit were made.

The constant changes in the various factors involved in matters of this kind, the uncertain and incalculable effect of human and community attitudes, the changing policies, purposes and plans of the administration, the opposition, support or indifference of holders of certificates of deposit and shareholders, with their commingled and divergent interests, all make it utterly impossible to insure the success or forestall the failure of any particular plan.

Many natural developments have tended to disintegrate the original plan, modifying its scope, application and potential utility. The passage of time since the plan was originally formulated in October, 1934, has borne solutions of several of the problems then apparently insurmountable. In every one of the seven associations then embraced in the plan there have been material changes, reductions in debts, increases in liquidity, and general modification in financial conditions. These facts cannot be ignored, and the court is compelled to give due weight to them in passing upon the applications before it. The withdrawal of the Mutual Home and Savings Association and the Permanent Building and Loan Association was rendered advisable by virtue of the improved conditions of the associations. These two associations were originally expected to yield considerable assistance, through voluntary allocation by the

depositors, when paid their claims, of on - third of the amount paid to them, to the capital structure of the proposed new Federal Savings and Loan Association. It was recognized that this allocation of a portion of the money paid to holders of certificates of claim would necessarily have to be voluntary, and no effort was made to bring that aspect of the matter before the court. The plan was not executed in regard to funds available from the certificate of deposit payments in these institutions, and the court is uninformed as to any consents being obtained for withholding any part of the payment, and as to any arrangements made with the depositors paid, to apply one-third of the amount paid to the capital structure of the new association. The depositors were paid in full, the amount paid in the Mutual Home and Savings Association being $601,084.14.

Since $2,000,000.00 of the capital structure of the proposed new Federal Association was to be raised by these voluntary allocations by the holders of certificates of deposit when paid from the loan, it is obvious that a complete failure of this part of the plan in reference to the depositors in the Mutual and Permanent Associations, presages like failure in reference to the depositors in the other five associations. With the Mutual and Permanent depositors not contributing to the required capital fund, and with the present proposal involving the payment of only 25% of the claims of certificate of deposit holders in the Miami and the Security Associations, it is obvious that practically the sole source of the $2,000,000.00 fund required is the loan money to be paid to the certificate of deposit holders in the Dayton, American and Franklin Associations.

If paid, the small and average certificate of deposit holder will need and use his money for the actual necessities of life, and if the large depositors are paid, their investments will not be influenced by this plan, so far as the record of the case informs the court. The court cannot disregard, therefore, this failure in a basic factor of the plan submitted, and this aspect of the problem, originally conjectural, is now definitely determined, adversely. The only evidence before the court as to formation of the new Federal Association consists of a letter from a small group of citizens to the Federal Home Loan Board, in the nature of an application. This application makes no commitment whatever as to the capital structure, nor as to the amount to be secured by popular subscription, and

it cannot be considered in any way as evidence of the probable formation of the Association, or the probability of $1,000,000.00 being raised voluntarily by private capital. The court requested full evidence in regard to this proposed Association, but the record discloses no evidence whatever was furnished. The court declines to speculate on the matter.

A complete failure of proof in this respect, therefore, requires rejection of consideration of a new Federal Association as a potential source of financial assistance to the Association and a factor in the present plan before the court. If it is a sound business proposition to form a new Association, it can be formed regardless of the acceptance or rejection of these loans, but the court cannot consider its speculative existence as of persuasive influence.

Failure of materialization of the plan for the formation of this Association may have a determinative effect, however, both upon the availability of funds from the Federal Home Loan Bank Board and upon the financing of mortgages defaulted in the associations and requiring either refinancing or foreclosure, by reason of the fact that all action of the Federal Home Loan Bank Board in relation to these associations is predicated upon formation of a new local Federal Savings and Loan Association.

The minutes of the Federal Home Loan Bank Board of November 27, 1934, marked as "Exhibit No. 9, Franklin", contained the following provisions:

"Whereas, certain citizens of Dayton, Ohio, propose to subscribe and pay in $1,000,000.00 to the shares of a Federal Savings and Loan Association, and

"Whereas, certain institutions in liquidation in the city of Dayton, Ohio, and/or certain investors in such institutions propose to subscribe and pay in approximately an additional $2,000,000.00 to the shares of the same proposed Federal Savings and Loan Association, and

"Whereas, such association is being organized for the purpose of rapidly rehabilitating the home mortgage situation in Dayton, Ohio, and said funds will be needed to assist in such program, Therefore,

"Be It Resolved by the Federal Home Loan Bank Board that the organization of such association be encouraged and that assurance be given to the proposed association upon organization that this Board will reserve for one year $1,000,000.00 and approve for subscription and payment a subscription in this amount, when properly

presented within one year and will approve for subscription and payment by the Secretary of the Treasury its request for Treasury subscription to its shares when properly presented, as is provided by law, up to at least $6,000,000.00, provided such requests are presented while funds are available in the Treasury for such subscriptions and payment."

The formation of this new Federal Association is also a condition of the commitment of the Federal Home Loan Bank Board as to further HOLC bonds, as evidenced by its resolution, made part of the record in this case, which is in the following terms:

"Whereas, officials representing the Division of Building and Loan Associations of the State of Ohio and certain building and loan associations of Dayton, Ohio, presented to the Board of Directors of the Home Owners' Loan Corporation a tentative plan contemplating the reorganization and liquidation of seven closed building and loan associations in that city, and

"Whereas, this Corporation has been requested to agree to said plan and to make available for exchange for mortgages in said association bonds in an amount not to exceed $12,000,000.00, therefore,

"Be it resolved that the Board of Directors of the Home Owners' Loan Corporation expresses its willingness to participate in said plan by the exchange of mortgages in the institutions involved for bonds of the corporation upon applications now in process of consideration to a maximum amount of $12,000,000.00, and agrees to set aside and make available for the purpose of exchange for eligible mortgages now owned by the associations involved, applications for refinancing of which were filed with this corporation on or before August 31, 1934, bonds with an aggregate par value of $12,000,-000.00, such bonds to be available for exchange notwithstanding the fact that one or more of said associations may be returned to the Board of Directors thereof by the Superintendent of Building and Loan Associations and permitted to reopen upon such conditions as said Superintendent may prescribe; provided, however, that this commitment shall be subject to the following conditions:

"1. That a Federal Savings and Loan Association be organized by interested parties in the City of Dayton with a paid in capital of approximately $3,000,000.00.

"2. That the Reconstruction Finance

Corporation agrees to make loans to the liquidators of the said seven closed building and loan associations, either under §687-1 or §687-21 GC, secured by assets of said closed building and loan associations in an aggregate amount not exceeding $21,210,000.00, for the purposes provided for in said plan.

"Be it Further Resolved, that this resolution shall supersede and revoke any action heretofore taken by this Board in conflict therewith."

An extremely important fact is that the entire loan of the Reconstruction Finance Corporation is conditioned upon evidence of the formation of the new Federal Association being furnished it before any of the proposed loans are paid out to the associations. Resolved Eighth, paragraph (1) of the Reconstruction Finance Corporation resolution agreeing to the loans is as follows:—

"(1) Delivery to the Custodian of statement of the Manager or Acting Manager of the Loan Agency and Agency Counsel that they have received satisfactory evidence that a Federal Savings and Loan Association has been organized by interested parties in Dayton, Ohio, with a capital of approximately three million dollars ($3,000,000.) and that the entire amount of such capital has been subscribed and paid in, or will be paid in simultaneously with the disbursement of this loan."

Failure of formation of this new Federal Association, therefore, destroys entirely the obligation of the Reconstruction Finance Corporation to make these loans, and by virtue of the resolution of obligation the loans cannot be made. This failure as to the new Association, then, defeats the whole plan and program as submitted to the court.

When the court is urged to make a decision on such vital matters as those now presented to it, it should and must require such clear evidence as would move a reasonably prudent business man to reach confidently a conclusion that the proposed venture was both safe and sound in principle, reasonably practical and productive in operation, and legal and equitable in results. These requirements are indispensable in cases of this nature, for a court judgment is endowed with such power, commanding and controlling by force of law, that it ought not to be employed in behalf of or against the rights and property of individuals, except upon clear proof of the wisdom and necessity of its employment.

As illustrative of the changes which have occurred and are now constantly occurring in the affairs of the association, it is pertinent to observe that such marked changes in the financial conditions of the associations were accomplished, between the time the plan was conceived and the time the court heard the cases, that instead of the original contemplated loans of approximately twenty million dollars being required, the sum now apparently required is approximately ten million dollars. Since the time of the hearings, further changes have occurred, and the most recent financial statements indicate further general improvements, affecting materially the need of these loans, as for illustration, the Franklin Association, which required $366,824.84, at the time the applications were filed, to pay the Reconstruction Finance Corporation, has paid the obligation in full now. The latest official records show decided reduction in other classes of obligations, and in all the associations.

As a further illustration of the constant changes in financial conditions, the Dayton Building and Savings Association sought originally from the Reconstruction Finance Corporation, according to the application, $2,336,189.72; the evidence showed it needed $585,924.31, whereas the reports of April 30, 1935, indicate it has cash on hand in the amount of $458,191.56, and has HOLC bonds and interim bond receipts of the value of $481,931.94, easily convertible, making a total available cash resource of approximately $940,123.50.

The court cannot ignore the public information that an application is imminent from the Deputy Superintendent in charge of the liquidation in Dayton for permission to pay out approximately $500,000.00 to the certificate of deposit holders in the Dayton Building and Savings Association, from the cash available. It is officially asserted that this may be done without placing the association in disadvantageous cash position, and in complete safety to the association. Obviously, these facts and purposes change, if they do not completely negative, necessity of making a loan of $585,924.31 from the Reconstruction Finance Corporation. Such cash position obtaining, and such action contemplated, it is plain that the court should not proceed utterly oblivious of the facts and approve a loan to accomplish for that association something which the new liquidator states may be accomplished easily, in substantial part, without a loan.

These changed and changing conditions in the associations, as well as the changing policies of the administration, reinforce the court's conclusion that no single plan, particularly one formulated when conditions were entirely different, can be regarded as the sole acceptable program of procedure in reference to these associations.

Considering, now, several contentions of the Superintendent advanced in support of these loans, the court's attention is directed to the matter of interest savings, which it is contended may be made under the proposed plan. The questions as to interest rights, and interest rates, under the contracts of the holders of certificates of deposit, are matters of controversial nature, involving serious legal propositions, both statutory and contractual. It is unnecessary to adjudicate these questions now as no factual case in that respect is before the court. The basic source of interest is the contract itself, and the interest rate is, generally speaking, referable to and governed by the terms of the contract, subject to the provision, however, that liquidation may, as a matter of fact and law, delay or change the operation of the contract, either by holding its enjoyment in abeyance, or under certain conditions, effecting a rescission. Obviously, until there is a factual case, involving the matter of final disposition of the associations by the State officials, the court could not be in a position to determine completely the rights of the contract depositor as to interest. Obviously, there is a wide divergence of facts possible under such contracts of deposit as are presented in the various associations, and many serious legal questions naturally attend the determination of interest rights under these contracts.

A very substantial ground of contention for approval of these loans is that by creating a fund to retire the claims of the holders of certificates of deposit and thus relieving the shareholders of that claim prior to stock claims, the stock itself will be given a greater market value and be legally usable in real estate transactions.

It appears to the court that both the stock and the certificates of deposit as securities are depressed in probably the natural proportion or ratio which would be expected when the entire building and loan situation is understood and the actual financial condition of these associations known.

The debt which must be satisfied ahead of any payment on stock is not liquidated by payment of the certificates of deposit, but a change is made from conditional creditors to demand creditors. The debt remains, more definitely determined, with greater legal security, and all income on pledged and unpledged assets impounded in a custodian fund. Such changes can scarcely be considered as creating any sound economic factors to change the actual worth of the stock. The stock being worth no more so far as its intrinsic value, the only enhancement of its owner-value will come if favorable psychological reaction of the public is created, resulting in wider market use.

The use of stock and certificates of deposit as marketable securities is not a matter of court control or decision. The law provided in the matter is very plain. §§687 and 687-9a, GC, particularly regulate the use of stock in purchase of association real estate. The entire matter is administrative, not judicial. A court decision favoring these loans is not essential to proper movement and use of stock certificates or certificates of deposit.

The Deputy State Superintendent in charge of liquidation has announced administrative plans in reference to this aspect of the associations' problems, changing the program from that obtaining when these applications were filed, and designed to accomplish the results originally sought by the plan submitted to the court.

In considering loans of this magnitude, the court has naturally been concerned with the method of payment and the probability of retirement of the loan within the maturity period. The court does not accept the contention of counsel for the shareholders that the Reconstruction Finance Corporation is inclined, or probably may be inclined, to unreasonably force collection of these loans by extreme measures. The record of the present loans, long overdue, indicates that the Corporation has not pressed the claims by court action or foreclosure proceedings of any kind.

However, it is extremely important to understand how the debt proposed to be made is to be retired. Aside from the income of the associations to be applied to interest and debt, it has been contended that the release value clause in the contract will enable retirement of the debt to be made.

It would undoubtedly be of assistance to the associations. However, as a measure to assure retirement of the Reconstruction Finance Corporation loan within the maturity period, its utility and effectiveness is untried and of indeterminate value. It appears to the court that if it is an excellent

provision to incorporate in the Reconstruction Finance Corporation contract for the proposed plan, it is obviously not against the interest of that Corporation and might be negotiated for inclusion in a new contract to refund the present obligations to that Corporation, or modify the collateral pledge provision, to enable greater facility in association recourse to and advantage from the pledged mortgages. However, it is not a persuasive reason for approval of further loans because this clause is in the new contracts. The court does not conclude that this provision can insure payment of the debt, and does not believe the debts to be included can be retired, by income and profits of operations. There is, in fact, no evidence even approximating proof that these debts can be paid. If they cannot be paid without basic sacrifice, the court regards it unsound business to assume them.

The court. however, does not overlook the fact that the release value clause, upon which so much reliance is placed for use in liquidating the loans to be made, is not mandatory upon the Reconstruction Finance Corporation, but is optional as to duration. The provision is in these words and terms:

"Resolved Ninth, That until otherwise ordered by this Corporation, the Custodian be and it is hereby authorized to release to the applicant any mortgages or deeds of trust listed on schedules required by sub-sections (1) and (2) of section B of Condition I of this Resolution, and notes secured thereby, or if such mortgages or deeds of trust, and notes secured thereby, are represented by trust receipts held by the Custodian, to release the applicant from the trust commitments recited in such trust receipts, upon delivery to the Custodian, in either instance, of the following:

"(1) Cash remittance equal to not less than the liquidating value (or the face amount whichever is the lesser) of the item or items of collateral to be released, as shown by said schedules, such remittance to be applied in accordance with the provisions of Resolved Fifth of this Resolution;

"(2) Certificate of the applicant, Identified by the Manager or Acting Manager of the Loan Agency, that the amount of cash remitted represents the entire cash proceeds received by applicant from settlement of such mortgage obligation or obligations."

This is a patently objectionable limitation upon an extremely important contract privilege.

The approval of the Reconstruction Finance Corporation, the Federal Home Loan Bank Board, the then State Finance Director, and Superintendent of Building and Loans, as well as others well informed as to local building and loan association difficulties should not be, and has not been, taken lightly by the court. The outstanding fact is that the many changes in association conditions, the necessary modifications of the plan, the decidedly different policies of the new liquidating agent, require consideration of the matter in a different light from that of October, 1934, when this plan was formulated.

Bearing in mind that the court has no control over the administrative and managerial policies of the associations, now or in the future, it is readily seen that its present opinion must be governed largely by the present conditions and policies, applying the evidence in the record.

Therefore, when considering proposals imposing loan obligations of this nature, the court is deeply concerned over the future use and effect of these proposed loans. In this connection, an extremely important question is presented to the court by the uncertainty of assured administrative attitude on the plan of the State in regard to these loans.

When the plan involved in these applications was originally submitted to the court, it entered court with the ardent approval of the State administration, and both the State Director of Finance and the State Superintendent of Building and Loan Associations advocated it emphatically. Such matters as these naturally require careful consideration, and ordinarily the court attaches considerable weight to the opinions and purposes of officials charged by law with trust and responsibility in such matters as these, and the court was entitled to definite assurance and definite support of the plan from the State administration if court approval was sought.

After practically two weeks of trial of the cases, the court was subjected to the unprecedented situation of having the cases on trial in this court and a new forum in the executive department at Columbus initiated, announced to be at the instance of those presenting the opposition of the shareholders. Had this occurred in a lawsuit of ordinary nature, the court would have acted peremptorily, but realizing that the new Superintendent of Building and Loan Associations required time to consider whether he should proceed with the applications, the court adjourned the hearing for

several weeks to enable the State administration to decide whether it was for or against the policy being urged upon the court. An extensive disavowal of the policy in the press was followed after several weeks with its re-adoption in court by the Superintendent.

This incident thoroughly establishes the utter uncertainty attending execution of policies in building and loan association matters, and contributes to the opinion of the court that its judgment on such grave matters, which must inevitably require years for solution, cannot be pronounced with assurance that there will be adherence to the basic plan of which the loan is an integral part, or that the present plan will be executed as proposed. The court, even though charged with the duty of passing upon applications emanating from the executive branch of the government, regards it wise judicial administration to withhold approval of such grave commitments, subject to such uncertain administrative changes and so remotely subject to court control in the future.

The court takes cognizance of the marked change of policies being announced by the new Deputy Superintendent in charge of the local closed associations, and these plans and proposed programs materially change the approach to the problems of the associations. It is impossible to estimate at present the ultimate effects of these policies, but it is very plain that no loans of this magnitude should be approved upon the assumption that the status shown in the record of the cases still obtains.

Various problems presented to the court during the hearings on the proposed loans have been approached by different methods; various limitations of fact and law heretofore urged as persuasive upon the court in behalf of approval of the proposed loans have been announced by the liquidating agent as no longer operative.

There has been a change of perspective and plans of operation in many respects, and the liquidating agent has specifically announced an intention to return the associations to shareholder management within a period of six months. This is a vital departure from the allegations of the applications, although some arguments, during the hearings, were to that effect. The court has not been advised as to the relation of these changed plans and new conceptions of the liquidating authorities to the proposed plan, but it is very apparent that they have distinct bearing upon the neces-

sity and potential effect of the loans proposed.

A recent communication of the new liquidating agent, accompanying the latest printed reports of the various associations, sent to the shareholders and released to the daily press, contains the following statements of policy:

"This report shows that your investment is principally in real estate and real estate mortgages. Such assets must be carefully handled and conserved in order to bring the most cash. Return to stockholder ownership by election of directors does not mean magic transformation of these assets into immediate cash. Therefore, remember that when you elect your new directors you must give them some time, because you do not want a terrible sacrifice and so you cannot expect immediate cash return. Pardon the emphasis, but we must all squarely face the facts.

"These associations will be returned to stockholders for election of directors as quickly as financial and legal problems will permit. While this is being worked out, activity in the sale of real estate will be stimulated, using securities of the institutions as partial payments. Future HOLC refinancing will be accomplished also by purchase of securities to prevent or reduce book losses. Dividends will be paid promptly as the money is accumulated. The big question of maintenance costs and rental collection is now being studied by an experienced committee. Operating expenses will be reduced. The new directors will be stockholders. Strenuous efforts will be made to collect delinquent rentals and deficiency judgments. Transfers of stock and deposits will be permitted on the records of the Associations. If you or your friends have recently purchased any such securities, bring them to the Association so that such transfer may be recorded. These various activities and others will be started, which will be helpful to the associations, not only now, but after they are returned."

These proposed loans, regardless of purpose several months ago, may be of entirely new significance and of utterly different materiality now. If the present plan of returning the associations to the shareholders within six months is carried out, the court is impressed with the lack of wisdom of approving the proposed loans, and thereby probably adding to the confusion, and possibly increasing the difficulty of establishing cooperation of the share-

holders with the State officials, and possibly handicapping the present liquidating agent with continued litigation paralyzing policies in regard to the Miami, Security, Dayton, Franklin and American Associations.

Many of the basic factors in the proposed plan may be ultilized regardless of approval or disapproval of the applications. As indicated before, the present liquidator in charge of the local associations has already announced use of several important operations proposed in the plans submitted in the applications. Nothing in the decision of the court requires rejection by the administration of any policy which it finds legal and helpful toward the solution of the conditions obtaining. Neither does this decision prevent formation of whatever financial institutions may be necessary to assist the associations.

A practical problem, outside the actual merits of this matter, has been developed by groups of the shareholders, whose organized opposition to the plan submitted to the court has resulted in transforming administrative problems into determined litigation, probably of a continuous nature. While recognizing the rights of shareholders in this respect the court realizes that litigation carries with it confusion, delays, doubts and antagonisms utterly destructive of that cooperation and mutual confidence so essential to the very existence of these associations. No plan submitted can successfully survive the inevitable delays attendant upon insistent litigation.

Under provisions of the law, even if the court granted these applications, the loans could not be made at this time if the shareholders should press legal opposition further, for §687-9 GC provides:

"No order of the Common Pleas Court or Judge thereof entered pursuant to this section shall be deemed a final order; but by leave of court an independent suit may be brought, not later than ten days after such order is entered, by any such person deeming himself aggrieved thereby, to restrain any action thereby authorized, provided, however, that if any order to sell, exchange or transfer otherwise, in bulk, all or a substantial part of the assets and property of an association be assented to by the holders of two-thirds in principal amount of the aggregate of the claims of unsecured creditors, depositors and shareholders of such association entitled to participate in the dividends therefrom, such order shall be binding upon all the creditors, depositors and shareholders of such association."

This privilege, if exercised, might conceivably delay the execution of the plan a long period of time, and this very delay would most probably destroy both the efficacy of the plan and the attendant assistance from the Reconstruction Finance Corporation and the Federal Home Loan Bank.

The court recognizes that if other court hearings should be conducted, by favor of the right to such injunctive relief, the welfare of these associations would be immeasurably endangered, particularly since the new administration is diligently pressing many new measures to improve the associations' conditions. It seems to the court that it is of imperative importance that cooperation and harmonious procedure be secured and that misunderstanding, hostility, and continued community-wide apprehension and anxiety be allayed, to the end that whether under State control or shareholder management, the associations may preserve and advance the interests of all concerned.

The court, therefore, for the reasons set forth, after the most mature deliberations, finds that the applications for these loans should be denied.

SNEDJKER, CECIL, DOUGLAS, PATTERSON and WHITE, JJ, concur.